UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x
UNITED STATES OF AMERICA          :
                                  :
                                  :        05 Cr. 903 (LAP)
          -v.-                    :
                                  :        OPINION AND ORDER
                                  :
KPMG LLP,                         :
                                  :
          Defendant.              :
                                  :
------------------------------x

LORETTA A. PRESKA, U.S.D.J.

     On January 2, 2007, the Court entered an order of nolle
prosequi without prejudice (the "Order") as to the information
filed in this case.  Several defendants in United States v.
Stein, No. S1 05 Cr. 888 (LAK) (S.D.N.Y.) then filed motions for
leave to intervene and appear as amicus curiae to, inter alia,
vacate the Order.  The Court accepted for filing the memoranda
in support of the motions and invited further submissions.  For
the reasons set forth below, the Order stands.


                          BACKGROUND

     On August 26, 2005, the Government and KPMG LLP ("KPMG")
entered into a deferred prosecution agreement (the "DPA").
(Spears Decl., Ex. 1).[1]  In connection with the DPA, KPMG waived

_____

[1] "Spears Decl." refers to the Declaration of David Spears in
Support of Motion of Jeffrey Stein to Appear as Amicus Curiae in
                                              (continued)

its right to be indicted and consented to the filing of a one-count felony information (the "Information") charging KPMG with a conspiracy to defraud the United States, evade taxes, cause the filing of false and fraudulent tax returns, and aid and assist in the preparation of false and fraudulent tax returns, in violation of 18 U.S.C. § 371.  (Id., Ex. 2).  On August 29, 2005, the DPA, the Waiver of Indictment, and the Information were filed.  (Id., Exs. 1-2; see also Dkt. Nos. 2-4).  That day a hearing was held where KPMG entered a plea of not guilty and knowingly and voluntarily entered into the DPA, which the Court approved.  (Spears Decl., Ex. 3 at 3/14-5/20 & 8/3-9/11).

As part of the DPA, KPMG accepted responsibility for the conduct of its partners and employees and described in detail how the firm had "[a]ssisted high net worth United States citizens to evade United States individual income taxes on billions of dollars in capital gain and ordinary income by developing, promoting and implementing unregistered and fraudulent tax shelters."  (Id., Ex. 1, ¶ 2).  Among other things, the DPA required KPMG to do the following: (i) pay $456 million to the Government (attributable to a criminal fine of

_____

(continued)
Opposition to Any Application for Dismissal of the Information Filed Against KPMG LLP, including the exhibits appended thereto, dated Dec. 29, 2006.

$128 million, criminal restitution to the IRS of $228 million, and a civil penalty to the IRS of $100 million) (id. ¶ 3); (ii) adopt various permanent restrictions on and elevated standards for its tax practice (id. ¶ 6); (iii) implement new compliance procedures and practice standards (id. ¶¶ 16-17); (iv) accept an independent monitor to oversee KPMG's compliance with the DPA (id. ¶ 18); and (v) cooperate with the Government's investigation into the conduct detailed in the Information (id. ¶¶ 7-9).

The DPA further provided that, based on KPMG's agreement to the terms and conditions therein, the Government would recommend to the Court that prosecution of the Information be deferred until December 31, 2006.  (Id. ¶ 10).  If, at that time, KPMG was in full compliance with its obligations under the DPA, the Government would seek to dismiss the Information without prejudice.  (Id. ¶ 11).  If, at that time, KPMG was not in full compliance with its obligations under the DPA, the Government could, in its discretion, extend further the period of deferral for one year.  (Id. ¶ 14).  If KPMG engaged in additional violations of the DPA, the Government could defer prosecution in additional one-year increments, not exceeding a total of five years.  (Id.).  However, regardless of when the deferral of prosecution ended or the Information was dismissed, the DPA provided that the term of monitorship extends through 2008, and

the requirement of cooperation continues without time limitation. (Id. ¶¶ 9 & 18(e)(I)).

On December 21, 2006, the Government submitted to the Court a proposed order, which stated, in part, that "assuming there are no violations of the terms of the [DPA] between [December 20, 2006] and December 31, 2006," the United States Attorney directs "that, with leave of the Court, an order of nolle prosequi without prejudice be filed as to Information 05 Cr. 903 (LAP) on or after December 31, 2006," pursuant to the terms of the DPA. (Gov't Stein Mem. at 2).[2]   The Court issued the Order on January 2, 2007. (Dkt. No. 8).

On December 29, 2006, Jeffrey Stein served the Government with a motion to intervene and appear as amicus curiae to oppose any application for dismissal of the Information. (Gov't Stein Mem. at 2). On January 3, 2007, Mr. Stein's motion was filed with the Court. (Id. at n.1; see also Dkt. No. 5). On January 4, 2007, the Court issued an order accepting for filing Mr. Stein's memorandum in support of his motion and granting Mr. Stein leave to appear as amicus curiae. (Dkt. No. 9). The Court permitted the Government to submit a response to Mr. Stein, which it did on January 16, 2007. (Dkt. No. 17). The Court also permitted Mr. Stein to submit a reply to the

---

[2] "Gov't Stein Mem." refers to the Letter from John M. Hillebrecht, Assistant United States Attorney for the Southern District of New York, to the Court, dated Jan. 16, 2007.

Government's response, which it did on January 19, 2007.  (Dkt.
No. 16).

On January 19, 2007, Philip Wiesner, Larry DeLap, David
Greenberg, John Lanning, Richard Smith, and Carol Warley
(collectively, the "Wiesner Intervenors") also filed a joint
motion to intervene and appear as amicus curiae to address the
public policy reasons why the Order should be vacated and
enforcement of the DPA should be denied.  (Dkt. No. 12).  On
January 25, 2007, the Court issued an order accepting for filing
the Wiesner Intervenors' memorandum in support of their motion
and granting them leave to appear as amicus curiae.  (Dkt. No.
19).  The Court permitted the Government to submit a response to
the Wiesner Intervenors, which it did on January 31, 2007.
(Dkt. No. 22).  The Court also permitted the Wiesner Intervenors
to submit a reply to the Government's response, which they did
on February 2, 2007.  (Dkt. No. 23).

Mr. Stein and the Wiesner Intervenors are defendants in
United States v. Stein, No. S1 05 Cr. 888 (LAK) (S.D.N.Y.)
("Stein"), a criminal case in this District pending before the
Honorable Lewis A. Kaplan.  The indictment in Stein charges Mr.
Stein, the Wiesner Intervenors, and other defendants, most of
whom are former KPMG partners or employees, with the following
illegal acts: (i) a conspiracy to defraud the United States,
evade taxes, and cause the filing of false and fraudulent tax

returns; (ii) substantive tax evasion; and, as to certain defendants, (iii) obstruction of the due administration of the tax laws. See United States v. Stein, 452 F. Supp. 2d 230, 237 (S.D.N.Y. 2006) ("Stein III"). The charges in Stein are based on essentially the same conduct that is acknowledged by KPMG in the DPA. Compare Spears Decl., Ex. 2 (Information against KPMG in this case), with Stein, Dkt. No. 57 (first superseding indictment against former KPMG partners and employees). KPMG is an unindicted co-conspirator in the Stein indictment. See Stein, Dkt. No. 57, ¶ 1.

There are many issues in the Stein litigation, some of which are currently on appeal. See Stein v. KPMG LLP, No. 06-4358-cv (2d Cir. Sept. 18, 2006) (notice of appeal filed by KPMG challenging Stein III) ("Stein Appeal").[3] Of principal concern to Mr. Stein and the Wiesner Intervenors is Judge Kaplan's conclusion that the Government violated the Fifth and Sixth Amendment rights of former KPMG partners and employees by causing KPMG to cut off payment of legal fees and other defense costs upon their indictment. See United States v. Stein, 435

---

[3] KPMG later "indicated that it favors proceeding by application for writ of mandamus," and the Court of Appeals "reserve[d] decision on whether [it] will treat the appeal as a petition for mandamus." (Stein Appeal, Dkt. Entry Dec. 13, 2006). Pursuant to Rule 21(b)(4) of the Federal Rules of Appellate Procedure, the Court of Appeals invited Judge Kaplan to address KPMG's motion for leave to file a mandamus petition. (Id.). Judge Kaplan accepted the invitation and has filed a response. (Id., Dkt. Entry Jan. 8, 2007).

F. Supp. 2d 330, 356-73 (S.D.N.Y. 2006) ("Stein I").   Judge
Kaplan found that, in an effort to avoid indictment, KPMG
changed its long-standing policy of paying the legal fees of its
personnel "because the [G]overnment held the proverbial gun to
its head" and that "[h]ad that pressure not been brought to
bear, KPMG would have paid [their] legal expenses." Id. at 336.

     Judge Kaplan "deferred the request of the [former KPMG
partners and employees] to dismiss the indictment based upon the
[G]overnment's misconduct, reasoning that dismissal might prove
inappropriate if KPMG were obligated to advance the defense
costs, in which case all or much of the harm caused and still
threatened by the [G]overnment's actions might be remedied or
avoided." Stein III, 452 F. Supp. 2d at 238.   Judge Kaplan then
"held that [he] has ancillary jurisdiction over the claims
against KPMG for advancement of defense costs and permitted the
assertion of those claims." Id.   Judge Kaplan also rejected
KPMG's argument that former partners and employees cannot
litigate their claims for defense costs in civil, summary fee
advancement proceedings because they are bound to arbitrate
those claims. Id. at 238-39.[4]   To compel arbitration under the

---

[4] The Court of Appeals stayed the civil proceedings in Stein
pending resolution of KPMG's appeal.   See Stein Appeal, Dkt.
Entry Oct. 19, 2006.

circumstances in <u>Stein</u> would, according to Judge Kaplan, be against public policy.   <u>Id.</u>

Mr. Stein and the Wiesner Intervenors contend that the Order should be vacated.  (<u>See</u> Stein Reply Mem. at 1; Wiesner Mem. at 1 & 18-19).[5]  According to Mr. Stein, "[f]or so long as KPMG continues to obstruct the proceedings in [<u>Stein</u>], the Information against it should not be dismissed because it would be against the public interest to dismiss when KPMG is actively and in bad faith interfering with the due administration of justice in [<u>Stein</u>]." (Stein Mem. at 6-7).[6]  According to the Wiesner Intervenors, the Court should vacate the Order on the ground that, <u>inter alia</u>, "the DPA's criminal fine and criminal restitution provisions violated fundamental constitutional principles of separation of powers." (Wiesner Mem. at 18-19).

Mr. Stein and the Wiesner Intervenors differ in their position as to whether the DPA should be enforced.  Mr. Stein requests that the parties return to the <u>status quo ante</u>, with

---

[5] "Stein Reply Mem." refers to the Memorandum of Law in Support of <u>Amicus Curiae</u> Jeffrey Stein's Motion to Vacate <u>Nolle Prosequi</u> Order, dated Jan. 19, 2007.  "Wiesner Mem." refers to the Memorandum of Law in Support of Motion for Leave to Intervene and Appear as <u>Amicus Curiae</u> to Address the Public Policy Reasons Why the Order Dismissing the Information Should be Vacated and Enforcement of the Deferred Prosecution Agreement Denied, dated Jan. 19, 2007.

[6] "Stein Mem." refers to the Memorandum of Jeffrey Stein in Support of Motion to Appear as <u>Amicus Curiae</u> in Opposition to Any Application for Dismissal of the Information Filed Against KPMG, dated Dec. 29, 2006.

the Information pending pursuant to the DPA for up to five years. (Stein Reply Mem. at 12-13). According to Mr. Stein, "[i]mplicit in that form of relief is the recognition that having the Information pending is undesirable to KPMG and represents a form of leverage over it which can and should compel it to avoid wrongdoing that could prolong its status as a defendant in a pending criminal case." (Id. at 13).

The Wiesner Intervenors oppose enforcement of the DPA because they claim it violates public policy on the following grounds: (i) it contravenes the principles of separation of powers because "the Government heedlessly arrogates to itself powers (the imposition of criminal punishment) that belong to two other branches: Congress and the Court;" and (ii) it is the product of Government misconduct. (Wiesner Mem. at 6-9 & 13-18). Accordingly, they seek the "return [of] the $356 million [in criminal fines and restitution] illegally and unconstitutionally exacted from KPMG, either by transferring the funds to the registry of the Court or to KPMG in an appropriate escrow account." (Id. at 19).

Finally, Mr. Stein and the Wiesner Intervenors request that the Court conduct a hearing in this matter after vacating the Order. Specifically, Mr. Stein requests an opportunity to present the evidence that Judge Kaplan reviewed to reach his conclusions in Stein I. (See Stein Reply Mem. at 14).

According to the Wiesner Intervenors, "[t]he Court should . . .
conduct further proceedings involving the [G]overnment, KPMG and
the intervenors/_amici_ to determine whether the public policy
reasons for denying dismissal of the Information and enforcement
of the DPA . . . can be cured or remedied in an appropriate
manner, which will likely necessitate revision or reformation of
the DPA." (Wiesner Mem. at 19).


## DISCUSSION

### 1.   Legal Standard for Dismissal of Information

"[T]he Government may, with leave of court, dismiss an
indictment, information, or complaint." Fed. R. Crim. P. 48(a).
The inclusion of the phrase "with leave of court" worked a
change in the common law practice of allowing prosecutors
complete discretion to file orders of _nolle prosequi_.   _Id._
advisory committee's note 1.

The text of Rule 48(a) of the Federal Rules of Criminal
Procedure provides no guidance as to the extent of the court's
discretion in reviewing a dismissal filed by the Government, or
the circumstances in which that discretion is properly
exercised, and the Supreme Court has not directly ruled on that
question. See _Rinaldi v. United States_, 434 U.S. 22, 30 n.15
(1977). The Court of Appeals has not addressed the scope of a
court's discretion under Rule 48(a) or the standards applicable

to the granting or withholding of leave to dismiss charges.  See
United States v. Rosenberg, 108 F. Supp. 2d 191, 202-05
(S.D.N.Y. 2000); United States v. Doody, No. 01 Cr. 1059, 2002
WL 562644, at *2 (S.D.N.Y. Apr. 16, 2002).

Courts in this District have found persuasive the holdings
of the Fifth Circuit, which has written more extensively on Rule
48(a) than any other Circuit.  See Rosenberg, 108 F. Supp. 2d at
202 n.15; Doody, 2002 WL 562644, at *2 n.1.  Long-standing Fifth
Circuit precedent interpreting Rule 48(a) holds that "[t]he
Executive [Branch] remains the absolute judge of whether a
prosecution should be initiated and the first and presumptively
the best judge of whether a pending prosecution should be
terminated."  United States v. Cowan, 524 F.2d 504, 513 (5th
Cir. 1975).  Accordingly, "[t]he exercise of [the Executive
Branch's] discretion with respect to the termination of pending
prosecutions should not be judicially disturbed unless clearly
contrary to manifest public interest."  Id. (emphasis added).

In Rinaldi, the Supreme Court recognized the "contrary to
manifest public interest" standard articulated by the Fifth
Circuit.  434 U.S. at 30 n.15.  According to the Supreme Court,
"[t]he principal object of the 'leave of court' requirement [in
Rule 48(a)] is apparently to protect a defendant against
prosecutorial harassment, e.g., charging, dismissing, and
recharging, when the Government moves to dismiss an indictment

11

over the defendant's objection." Id.  The Supreme Court went on
to note that Rule 48(a) "has also been held to permit the court
to deny a Government dismissal motion to which the defendant has
consented if the motion is prompted by considerations clearly
contrary to the public interest." Id. (citing, inter alia,
Cowan, 524 F.2d at 513).

Following Rinaldi, the Fifth Circuit further clarified the
"contrary to manifest public interest" standard.  In United
States v. Hamm, 659 F.2d 624, 628 (5th Cir. 1981), the Fifth
Circuit held that denial of a dismissal motion, consented to by
the defendant, is limited to "extraordinary cases where it
appears the prosecutor is motivated by considerations clearly
contrary to the public interest."[7]  Then, in United States v.
Smith, 55 F.3d 157, 159 (5th Cir. 1995), the Fifth Circuit
stated that "[a dismissal] motion that is not motivated by bad

---

[7] Other courts "have reserved [on] the question of whether, under
Rule 48(a), a judge may ever deny an uncontested motion to
dismiss." In re Richards, 213 F.3d 773, 787 (3d Cir. 2000)
(citations omitted).  In Rinaldi, the Supreme Court stated that
"[i]t is unnecessary to decide whether the court has discretion"
when the defendant has consented to the dismissal and said
dismissal is prompted by considerations clearly contrary to the
public interest.  434 U.S. at 30 n.15.  In United States v.
Gonzalez, 58 F.3d 459, 461 (9th Cir. 1995), the Ninth Circuit
stated that "in the category of cases in which the defendant
consents to the prosecution's request, there is a question as to
whether a district court may ever deny an uncontested Rule 48(a)
motion."  For purposes of this decision, the Court does not need
to decide this question and simply assumes that it has the
limited discretion to deny an uncontested motion to dismiss if
to do so would be "contrary to manifest public interest."

faith is not clearly contrary to manifest public interest, and it must be granted." Examples of conduct that would be "contrary to manifest public interest" in connection with a dismissal of criminal charges are when "the prosecutor appears motivated by bribery, animus towards the victim, or a desire to attend a social event rather than trial." In re Richards, 213 F.3d at 787 (citing Hamm, 659 F.3d at 630).

When determining the propriety of an uncontested dismissal motion under Rule 48(a), the judicial inquiry turns on "whether the prosecutor acted in good faith at the time he moved for dismissal." Smith, 55 F.3d at 159. In making this determination, the presumption is that the Government is acting in good faith. See Rinaldi, 434 U.S. at 30 ("Our examination of the record has not disclosed (and we will not presume) bad faith on the part of the Government at the time it sought leave to dismiss the indictment against petitioner.") (emphasis added); see also United States v. Jacobo-Zavala, 241 F.3d 1009, 1012 (8th Cir. 2001) ("[T]he presumption of regularity supports [the Government's] prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that the[] [Government] ha[s] properly discharged [its] official duties."); United States v. Salinas, 693 F.2d 348, 351 (5th Cir. 1982) ("Neither the trial court nor this Court on appeal can substitute its judgment for the prosecutor's determination [of

the public interest] or can second guess the prosecutor's evaluation.").

Although, "the prosecution does not have the burden of proof to show that dismissal is in the public interest, it is under a duty to provide sufficient reasons to the court that amount to more than a mere conclusory interest." United States v. Fastow, 300 F. Supp. 2d 479, 482 (S.D. Tex. 2004) (citing United States v. Welborn, 849 F.2d 980, 983 (5th Cir. 1988)). Thus, "to honor the purpose of the rule, the trial court at the very least must know the prosecutor's reasons for seeking to dismiss the indictment and the facts underlying the prosecutor's decision." United States v. Derr, 726 F.2d 617, 619 (10th Cir. 1984). "Mere conclusory statements by the [Government] that dismissal is in the public interest" will not suffice under Rule 48(a). United States v. Ammidown, 497 F.2d 615, 620 (D.C. Cir. 1973).

Given the very limited scope of judicial inquiry permitted under Rule 48(a), and the presumption of good faith on the part of the Government in seeking dismissal of charges, it is unsurprising that it appears that no appellate court has upheld a denial of a motion to dismiss, where the defendant has consented to the dismissal, grounded on a finding of "bad faith" or action "contrary to the public interest" alone. See, e.g., In re United States, 345 F.3d 450, 453 (7th Cir. 2003) (granting

14

the Government's petition for mandamus and ordering the district court to dismiss certain counts of an indictment against a defendant where that defendant consented to the dismissal: "We are unaware . . . of any appellate decision that actually upholds a denial of a motion to dismiss a charge on such a basis.  That is not surprising.").


2.   <u>Application to the DPG</u>

     As a threshold matter, the Court rejects Mr. Stein's and the Wiesner Intervenors' challenge to the Order on the ground that they lack standing to seek its vacatur.  <u>See, e.g.</u>, <u>In re Appointment of Indep. Counsel</u>, 766 F.2d 70, 75 (2d Cir. 1985) ("[A]s standing derives from Article III's limitation on federal judicial power, it is a threshold issue in every case.").  It is well-settled that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."  <u>Linda R.S. v. Richard D.</u>, 410 U.S. 614, 619 (1973); <u>see also</u> <u>Esseily v. Guiliani</u>, No. 00 Civ. 5271, 2000 WL 1154313, at *1 (S.D.N.Y. Aug. 14, 2000) ("[C]riminal . . . prosecutions are within the province of the . . . District Attorney who ha[s] complete discretion over the decision to . . . prosecute.  In other words, private citizens have no standing to force . . . prosecutions in federal court."); <u>cf.</u> <u>Lewis v. United States</u>, 216 U.S. 611, 612-13 (1910) (holding that defendant lacked

standing to appeal because he was not aggrieved by entry of a
<u>nolle prosequi</u> against him).

Mr. Stein and the Wiesner Intervenors are not parties to
this criminal prosecution.  Rather, they are defendants in a
separate, ongoing, criminal prosecution before Judge Kaplan.
The Wiesner Intervenors effectively conceded that they have no
standing by stating that the only party with standing to
challenge the Order or to seek the return of the criminal fines
and restitution is KPMG.  (<u>See</u> Wiesner Reply Mem. at 2).[8]
Accordingly, neither Mr. Stein nor the Wiesner Intervenors has a
cognizable interest in the dismissal of the Information against
KPMG pursuant to the DPG.

Assuming <u>arguendo</u> that Mr. Stein and the Wiesner
Intervenors have standing, their bases for seeking vacatur of
the Order are meritless.  Since KPMG did not object to the
dismissal of the Information, they are left only with the
argument that dismissal is "contrary to manifest public
interest."  However, neither Mr. Stein nor the Wiesner
Intervenors has established that the Government is acting in bad
faith at this time by honoring its contractual obligation to
KPMG under the DPA.

---

[8] "Wiesner Reply Mem." refers to the Reply Memorandum of Law in
Support of Intervenors' Motion Addressing the Public Policy
Reasons Why the Order Dismissing the Information Should be
Vacated and Enforcement of the Deferred Prosecution Agreement
Denied, dated Feb. 2, 2007.

Mr. Stein's allegations do not provide a basis for vacating the Order because "the salient issue . . . is not whether [some earlier decision by the Government] was made in bad faith but rather whether the Government's later efforts to terminate the prosecution were similarly tainted with impropriety." Rinaldi, 434 U.S. at 30.  Mr. Stein contends that the Government acted in bad faith by coercing KPMG, through the "Thompson Memo"[9] and otherwise, to refuse to advance legal fees to Mr. Stein and others.  (See Stein Reply Mem. at 12).  However, even Mr. Stein's characterization of the Government's prior conduct does not dispute that these events took place in 2004.  See Stein I, 435 F. Supp. 2d at 339-47.  Thus, Mr. Stein's assertion of bad faith is not cognizable.

To the extent Mr. Stein is claiming that "the [G]overnment is per se tainted and conflicted in the proceeding by what has gone in [Stein], and its motivation is demonstrably to reinforce its position that neither it nor KPMG has done anything wrong in [Stein]," his claim is not cognizable because the asserted

---

[9] The "Thompson Memo" refers to a memorandum issued by Larry D. Thompson, then-Deputy Attorney General, United States Department of Justice, to all United States Attorneys on January 20, 2003 entitled "Principles of Federal Prosecution of Business Organizations."  The Thompson Memo is available at http://www.usdoj.gov/dag/cftf/corporate_guidelines.htm (last visited Feb. 14, 2007).  In general, under the Thompson Memo, "a corporation's promise of support to culpable employees and agents . . . through the advancing of attorneys fees . . . [could] be considered by the prosecutor in weighing the extent and value of a corporation's cooperation."  (Id.).

"wrong" again unquestionably refers back to events that transpired in 2004. (Stein Reply Mem. at 12). In <u>Rinaldi</u>, the Supreme Court rejected the notion that earlier bad faith conduct by the Government persists indefinitely, thereby infecting every future Government act. 434 U.S. at 30. Mr. Stein attempts to circumvent <u>Rinaldi</u> by asserting that the Government is deriving some "benefit" currently from KPMG's refusal to pay his legal fees. (Stein Reply Mem. at 11; <u>see also</u> Stein Mem. at 17-18). However, Mr. Stein cites no case law suggesting that this rises to the level of "bad faith." Moreover, Mr. Stein's claim is belied by the fact that "the Government has repeatedly stated on the record in <u>Stein</u> that KPMG is absolutely free to pay fees and that a decision to do so would not be construed by the Government as in any way a breach of the DPA." (Gov't Stein Mem. at 8).

The Wiesner Intervenors' allegations also provide no basis for vacating the Order. They maintain that, by including provisions requiring the payment by KPMG of restitution and other penalties to the Government, the DPA has trampled on the prerogative of both the legislative branch to determine forms of

punishment and the judicial branch to impose punishment.[10]  (See Wiesner Mem. at 7-9).

In support of this assertion, the Wiesner Intervenors cite no case law holding that a deferred prosecution agreement with a fine and/or restitution component is unconstitutional.  (See Wiesner Mem. at 9-13).  This is not surprising because deferred prosecution agreements with restitution and/or other monetary components are entirely consistent with the fundamental principle that the Executive Branch alone is vested with the power to decide whether or not to press charges.  See ICC v. Brotherhood of Locomotive Engineers, 482 U.S. 270, 283 (1987)

---

[10] The Wiesner Intervenors also contend that the Order "should be vacated on the ground that it was entered without public notice of the [G]overnment's application for the [O]rder, thereby infringing the public's First Amendment rights." (Wiesner Mem. at 2).  Mr. Stein makes a similar argument. (See Stein Reply Mem. at 7-9).  However, by granting Mr. Stein and the Wiesner Intervenors leave to file their memoranda in support of their motions to vacate the Order and permitting further briefing on the merits (all of which has been placed on the public docket), the Court has used Rule 48(a) to "serve an important interest as an information- and accountability-producing vehicle."  In re Richards, 213 F.3d at 788.  Thus, the Government has been forced to "publicly reveal [its] reasons for not proceeding before granting a requested dismissal."  Id. at 789.  In other words, the Government has been forced to make the following statement on the public record: "[c]oncluding that KPMG has complied with its obligations (including those obligations relating to oversight by an independent monitor), and that dismissal of the Information would thus be in the interests of justice, the United States Attorney exercised his discretion to seek dismissal of the criminal charges without prejudice." (Gov't Stein Mem. at 7).  Rule 48(a) does not require anything more and does not permit the relief sought by Mr. Stein and the Wiesner Intervenors.

("[I]t is entirely clear that the refusal to prosecute cannot be the subject of judicial review."); United States v. Bonnet-Grullon, 212 F.3d 692, 701 (2d Cir. 2000) (stating that the decision of what federal charges to bring against any given suspect is within the province of the Executive Branch), superseded by statute on other grounds by United States v. Leiva-Deras, 359 F.3d 183, 188 (2d Cir. 2004); see also In re Richards, 213 F.3d at 786 ("[T]he substantive reach of . . . [R]ule [48] appears to be effectively curtailed by the fact that even if the judge denies the motion to dismiss, there seems to be no way to compel the prosecutor to proceed."). Accordingly, courts have routinely approved or entered deferred prosecution agreements containing restitution components and/or other remedial measures or sanctions voluntarily agreed to by the parties. (See Gov't Wiesner Mem. at 4-5 (listing cases involving deferred prosecution agreements with entities)).[11]

Lacking any controlling precedent in support of their attack on the DPA, the Wiesner Intervenors are left attempting to analogize the DPA to a "disfavored dismissal-release agreement[], whereby a prosecutor agrees to [a] dismissal of criminal charges contingent upon the putative defendant's agree[ment] to release law enforcement officials and agencies

_____

[11] "Gov't Wiesner Mem." refers to the Letter from Stanley J. Okula, Jr., Assistant United States Attorney for the Southern District of New York, to the Court, dated Jan. 31, 2007.

from any [civil] liability." (Wiesner Mem. at 10).  This argument is unavailing for two reasons.  First, as they concede, such agreements may be "disfavored" but they are not per se invalid.  See Newton v. Rumery, 480 U.S. 386, 387-88 (1987).  Moreover, the analogy is misplaced because the financial payments by KPMG were made to the victim of its criminal misconduct, i.e., the Government.  Thus, there is no impermissible conflict of interest here.

The Court agrees with the Government that "[a]cceptance of the arguments advanced by the [Wiesner] Intervenors would mean that, in those cases where it determined, in the exercise of its discretion, that the sanction of a criminal conviction was not warranted, the [Government] would be stripped of the ability and power both to vindicate the rights of victims and reform or otherwise address the conduct of criminal wrongdoers." (Gov't Wiesner Mem. at 5).  As the Government states, "[t]his would be an absurd result because it would force the [Government] to seek criminal charges in cases where it might otherwise have decided that such charges were unnecessary or inappropriate, thereby intruding profoundly on the constitutionally-grounded right of the Executive Branch -- and the Executive Branch alone -- to make rational and just charging decisions." (Id.).  In the instant case, involving one of the largest accounting firms, the Government sought the DPA and now a dismissal of deferred

charges.  In a similar case, involving one of the then-largest
account firms, the Government sought an indictment and
prosecuted the firm.  See Arthur Andersen LLP v. United States,
544 U.S. 696 (2005).  Given the dramatic consequences (foreseen
and unforeseen) that can unfold from the Government's
prosecution of an entity, it is critical that the Government
have some flexibility in this regard.

    In sum, the gravamen of Mr. Stein's motion and the Wiesner
Intervenors' motion is the relief being sought by them in the
Stein legal fees litigation -- i.e., KPMG should be compelled to
pay their legal fees.  According to Mr. Stein, "the [G]overnment
benefits from KPMG's ongoing refusal to pay Mr. Stein's legal
expenses, because it means the [G]overnment can deal with a less
well-financed, and therefore less effective, adversary." (Stein
Mem. at 18).  According to the Wiesner Intervenors, "[i]n order
to obtain the very DPA here at issue, KPMG served as the
[G]overnment's agent and henchman by improperly cutting off
legal fees to its own partners and employees despite a decades-
long policy of invariably paying such fees" and that "[i]ts
interim reward was the DPA; its ultimate reward is the dismissal
of the Information for which the [G]overnment seeks the leave of
this Court." (Wiesner Mem. at 7).  Thus, Mr. Stein and the
Wiesner Intervenors seek to vacate the Order in an effort to
compel KPMG to change its policy either by having the prospect

of a prosecution continue to hang over its head or by having
$356 million available to it for the payment of legal fees.
(See Wiesner Reply Mem. at 3 n.1 ("KPMG can break the log jam in
[Stein] and further the administration of justice . . . by
seeking a remedy under which an appropriate portion of its
illegally exacted funds is used for payment of legal fees to
remedy the constitutional violations found in Stein I.")).

Mr. Stein's motion and the Wiesner Intervenors' motion are
attempts to gain some advantage in their civil suits against
KPMG in another forum.[12]  The propriety, merits, and outcome of

---

[12] The Wiesner Intervenors' request that the Government "return
the $356 million [in criminal fines and restitution] illegally
and unconstitutionally exacted from KPMG, either by transferring
the funds to the registry of the Court or to KPMG in an
appropriate escrow account" (Wiesner Mem. at 19) is simply an
attempt to relitigate an issue in Stein I.  The forum for the
Wiesner Intervenors' argument (that the doctrine of "illegal
exaction" circumvents the doctrine of sovereign immunity,
thereby permitting the Court to order the Government to return
the $356 million) was Judge Kaplan's courtroom.  As Judge Kaplan
held in Stein I, "requiring the [G]overnment to pay the money
from a particular account or to forego revenues to which it is
entitled would not make such relief any less a monetary
sanction" that runs afoul of the doctrine of sovereign immunity.
435 F. Supp. 2d at 376 n.223.  In any event, the Wiesner
Intervenors lack standing to assert an "illegal exaction" claim
here.  An "illegal exaction" claim may only be maintained where
"the plaintiff has paid money over to the Government, directly
or in effect, and seeks return of all of part of that sum" that
"was improperly paid, exacted, or taken from the claimant in
contravention of the Constitution, a statute, or a regulation."
Eastport S.S. Corp. v. United States, 178 Ct.Cl. 599, 605, 372
F.2d 1002, 1007 (1967), overruled on other grounds by Claude E.
Atkins Enter., Inc. v. United States, 15 Ct.Cl. 644, 646 & n.2
(1988); see also Aerolineas Argentinas v. United States, 77 F.3d
(continued)

those suits are not for this Court to decide.  It is the private interests of Mr. Stein and the Wiesner Intervenors -- not the public's interest -- that are the underlying bases for their appearances here.  Such private interests have no role in the Executive Branch's decision-making with respect to the enforcement of the criminal laws.  See United States v. Greater Blouse, Skirt & Neckwear Contractors Assn., 228 F. Supp. 483, 490 (S.D.N.Y. 1964) ("The purpose of an indictment is not to aid the private interests of a party engaged in controversy with others . . . ."); see also FDIC v. White, 76 F. Supp. 2d 736, 739 (N.D. Tex. 1999) ("It was never contemplated in the law that either the actual or threatened use or misuse of criminal process, legal or illegal, should be resorted to for the purpose of compelling the payment of a mere debt, although it may be justly owing and due . . . .  Ample civil remedies are afforded in the law to enforce the payment of debts and the performance of contracts, but the criminal law and the machinery for its enforcement have a wholly different purpose . . . .") (quoting Hartford Fire Ins. Co. v. Kirkpatrick, 111 Ala. 456, 20 So. 651,

_____

(continued)
1564, 1573 (Fed. Cir. 1996) ("[A]n illegal exaction has occurred when 'the Government has the citizen's money in its pocket.' Suit can then be maintained . . . to recover the money exacted.") (quoting Clapp v. United States, 127 Ct.Cl. 505, 117 F. Supp. 576, 580 (1954)).  It is undisputed that KPMG, not the Wiesner Intervenors, paid the $356 million that was purportedly taken by the Government.

654 (1896)); cf. Restatement (Second) of Torts § 682 (1977)

("One who uses a legal process, whether criminal or civil,

against another primarily to accomplish a purpose for which it

is not designed, is subject to liability to the other for harm

caused by the abuse of process.").[13]

---

[13] Nothing in this decision alters the calculus for the
Government to provide incentives to KPMG to pay the legal fees
at issue in Stein I or for KPMG to pay those fees of its own
volition.  As noted above, the cooperation clause in the DPA
survives dismissal of the Information and, thus, "[i]t may well
be in [the Government's] interest to use that influence or power
to cause KPMG to advance the defense costs." Stein I, 435 F.
Supp. 2d at 380.  Moreover, according to Judge Kaplan, "KPMG is
[not] lacking in incentives . . . to aid the [G]overnment in
solving the problem the [G]overnment created for itself" because
"KPMG may conclude that obstruction of the efforts of its former
partners and employees to obtain advancement of defense costs,
or even a prompt adjudication of their right to such
advancement, would not further its interest in recruiting and
retaining top flight personnel" Id.  Recent events have also
minimized, if not eliminated, the incremental risk of
prosecution to KPMG (if ever there was any) if it chooses now to
pay the legal fees of its former partners and employees.  First,
as noted above, the Government represented in Stein I "that any
payment by KPMG of the defense costs of [its former partners and
employees] is acceptable to the [G]overnment and will not be
considered in determining whether KPMG has complied with the DPA
or otherwise prejudice KPMG." Id. at 382.  Second, on December
12, 2006, the Government issued new guidance on the issue of the
advancement of legal fees by business entities to their
employees and how that factors into the Government's decision to
prosecute an organization.  See Paul J. McNulty, Deputy Attorney
General, United States Department of Justice, "Principles of
Federal Prosecution of Business Organizations," available at
http://www.usdoj.gov/dag/speech/2006/mcnulty_memo.pdf (last
visited Feb. 14, 2007) (the "McNulty Memo").  The McNulty Memo
superseded and replaced the Thompson Memo.  Now, the rule is
that "[p]rosecutors generally should not take into account
whether a corporation is advancing attorneys' fees to employees
or agents under investigation and indictment" and, in the
                                                  (continued)

## CONCLUSION

For the reasons set forth above, the intervenors' motions to vacate the Order [dkt. nos. 5, 12, and 15] are denied.


SO ORDERED:

DATED:      New York, New York
            February 14, 2007

*Loretta A. Preska*

LORETTA A. PRESKA, U.S.D.J.

---

(continued)
"extremely rare" case when such fees are taken into account by the Government, prior "approval must be obtained from the Deputy Attorney General."  McNulty Memo at 11.